# Hygrosol Pharmaceutical Corp. v. Roberts

C.P. of Philadelphia County, November Term, 2012 No. 00213

*Conlin J. O'Boyle, Mary E. Kohart* and *Timothy T. Myers*, for plaintiffs Spiridon Spireas and Hygrosol Pharmaceutical Corp.

*Robert A. Limbacher, Brandon L Goodman, Donald C. Le Gower* and *Christopher R. Boisvert*, for defendants King Pharmaceuticals Research and Development, Inc. and King Pharmaceuticals, Inc.

*Grant S. Palmer, Rosemary McKenna*, and *G. Craig Lord*, for defendants IP Holdings, Inc., Pharmaceutical Holdings Company, Inc. and Richard Roberts.

SNITE, *J.*, December 13, 2013—In June 1996, Dr. Spiridon Spireas ("Spireas") and Dr. Sanford Bolton ("Bolton") submitted a patent application with the Unites States Patent and Trademark Office as inventors of processes and technologies relating to "liquisolid" technology. The patent was issued to Spireas and Bolton in October of 1998. Subsequent patents were issued to Spireas and Bolton which also involved liquisolid technology.

In June of 1998 a license agreement was executed between Mutual Pharmaceutical Company, Inc. ("Mutual") and Hygrosol Pharmaceutical Corporation ("Hygrosol"), Spireas, and Bolton for the use and commercialization of liquisolid technologies. Mutual entered into an agreement in March of 1999 to employ Spireas as Vice President of Research and Development of Mutual. Additionally, Mutual entered into a development agreement with SigmaPharm, Inc. Spireas' consulting company, a corporation engaged in the development of other new

pharmaceutical technologies.

On January 29, 2010 plaintiffs Spireas, Bolton, and Hygrosol, through named plaintiff SigmaPharm, sued Mutual and King Pharmaceuticals, Inc. ("King") in the District Court for the Eastern District of Pennsylvania. In the District Court action Spireas, through SigmaPharm, alleged that both Mutual and King prevented generic competition for Skelaxin, a muscle relaxant, and thereby violated Section 1 of the Sherman Act, 15 U.S.C. §1. On March 2, 2011, the District Court dismissed the SigmaPharm complaint finding that SigmaPharm did not suffer an antitrust injury, and therefore lacked standing. The United States Supreme Court denied SigmaPharm's petition for writ of certiorari.[1]

On May 6, 2011 Mutual filed a complaint in the Philadelphia Court of Common Pleas against Spireas and Bolton. All of the claims alleged in Mutual's complaint, as well Spireas' counterclaims, relate to the 1998 license agreement.

In the 2011 action, *Mutual v. Spireas, Bolton and Hygrosol*[2], Mutual alleged that Spireas and Bolton breached the terms of the 1998 license agreement by making false representations as to ownership of the liquisolid technology. Mutual maintained that Spireas and Bolton represented that they were the exclusive and sole owners of all rights and interests in the patent, processes,

---

1. Although defendants have requested that I also dismiss the second amended complaint on the grounds of *res judicata* because of the federal dismissal and affirmances; I decline to so hold because I do not believe I have the present ability to make such a determination. However, the Sherman Act dismissal does reinforce my belief as to the appropriateness of my current order.

2. May 2011 No. 0741.

and technology for liquisolid. Mutual alleged, however, that all such rights are, and continue to be, owned by St. John's University.[3]

On January 6, 2012 Spireas filed an answer to Mutual's complaint asserting counterclaims against Mutual and United Research Laboratories, Inc. ("URL"). Spireas claimed that he owned the liquisolid technology.[4] Spireas counterclaimed that Mutual breached the license agreement by failing to pay Hygrosol in connection with the license agreement, disclosing confidential information to King in violation of the license agreement, failing to pay licensing fees required under the license agreement, and failing to account for products developed under or using the patent as required by the license agreement. Additionally, Spireas counterclaimed for conversion, accounting, fraud in the inducement, and unjust enrichment.

On January 7, 2012 Spireas filed a third-party complaint naming Mutual, URL, Richard Roberts ("Roberts"), Pharmaceutical IP Holdings ("Pharma IP"), Pharmaceutical Holdings ("Pharma Holdings"), King, and King Pharmaceutical Research and Development, Inc. ("King R & D") as third-party defendants. In the third party complaint Spireas alleged violations of § 1962(a)-(d) of the federal Racketeer Influenced and Corrupt Organizations Act, as well as counts for restraint of trade under Pennsylvania law, unlawful and unfair competition under the California Business and Professions Code,

_____

3. The patent for liquisolid technology was related to the research done by Dr. Spireas in connection with his doctoral work while Dr. Bolton was his thesis advisor at St. John's University.

4. Ownership of the patent is currently being litigated in the New York District Court action *St. John's University v. Bolton et al.*, Case No. 08-CV-5309 (NGG) (JMA) (E.D.N.Y.)

breach of contract under Pennsylvania Law, breach of license agreement, and civil conspiracy to commit barratry, fraud, and breach of fiduciary duty. Shortly thereafter, on January 9, 2012, SigmaPharm filed a Petition to Intervene as a Third Party Plaintiff.

On February 15, 2012 third party defendant King filed a notice of removal to remove the action to the United States District Court for the Eastern District of Pennsylvania. King argued that removal to federal court was appropriate because the federal RICO claims and related allegations in the third party complaint asserted against King and other third party defendants were separate and apart from the underlying state law breach of contract claims. On July 3, 2012 the United States District Court for the Eastern District of Pennsylvania remanded the third party complaint back to the Philadelphia Court of Common Pleas. The District Court concluded that neither counterclaim defendants, nor third party defendants, may remove a civil action from a state court to federal court because they are not "defendants" within the meaning of 28 U.S.C. § 1441(a) which states that "any civil action brought in a state court of which the district courts of the united States have original jurisdiction, may be removed by the defendant or the defendants..."[5] Consequently, in order for King defendants to make a successful application for removal of the case to federal court the cases would need to be severed, putting King defendants in the position of defendant rather than third party defendant.

On August 16, 2012 a motion to sever the third-party Complaint was filed as well as preliminary objections to

---

5. *See Foster v. City of Philadelphia*, 826 F.Supp. 2d 778, 780-81 (E.D.Pa. 2011).

the third-party complaint. The motion to sever, filed by third party defendants, argued that the two complaints addressed fundamentally different issues between different parties over different periods of time which requires different evidence. On September 28, 2012 Spireas filed amended counterclaims against Mutual and URL. The amended counterclaims included violations of 18 U.S.C. § 1962(a)-(d) and N.J.S.A. 2C:41-2(a)-(d)[6] and claims for breach of license agreement, accounting, barratry and civil conspiracy, conversion, and unjust enrichment. On September 28, 2012 Spireas also filed an amended third party complaint as to Roberts, Pharma IP, Pharma Holdings, King, and King R&D. The amended third party complaint alleged violations of N.J.S.A. 2C:41-2(a)-(d) and claims for interference with contractual rights. The September 28, 2012 amended third party complaint, by rule, had to have preliminary objections filed by October 18, 2012. The preliminary objections would have been assigned to me shortly thereafter.

On October 3, 2012 while the response time for the amended third party compliant was still existent, the court granted Mutual's motion to sever the third-party complaint requiring plaintiffs to refile their third-party claims as a separate action.[7] This had the effect of separating the breach of license agreement claims and the NJ RICO claims. On October 11, 2012 Hygrosol and Spireas filed a motion to vacate the court's October 3rd order. These third party plaintiffs argued that the third party defendants' motion to sever addressed third party plaintiffs' original complaint, filed January 7, 2012, and not their pending

6. New Jersey's RICO statute.
7. It is the court's recollection, which might be incorrect, that it was unaware of the September 28, 2012 filings as of October 3, 2012.

amended complaint. On October 19, 2012 the court denied third party plaintiffs motion to vacate the October 3, 2012 order, but clarified that the severance was to apply to the September 28, 2012 amended complaint.

Pursuant to the severance order, plaintiffs instituted the present action on November 5, 2012 by filing a complaint asserting claims for violations of N.J.S.A. 2C:41-2(a)-(d), interference with contractual rights against Roberts, Pharma IP, Pharma Holdings, King, and King R & D.[8] Defendants filed preliminary objections to the complaint on December 14, 2012.[9] On January 16, 2013 the parties stipulated that the Defendants' preliminary objections would be deemed moot without prejudicing defendants' right to refile preliminary objections following plaintiffs' submission of an amended complaint. Plaintiffs filed an amended complaint on January 24, 2013 restating the NJ RICO and tortious interference claims and adding a claim for civil conspiracy. In the amended complaint plaintiffs allege four counts of New Jersey Civil RICO violations. It alleges defendants engaged in a pattern of racketeering by using, or causing another to use, the mails and interstate wires of the United States to transmit documents or information which, among other things: generated investment proceeds, as alleged in Count I; served to facilitate defendants' control over the enterprises, as alleged in Count II; were connected to defendants' participation in the enterprises, as alleged in Count III;[10]

---

8. No Federal RICO claims were filed. Consequently, the present complaint was not subject to removal to federal court, even though the third party defendants were now original defendants.

9. Defendants' December 14, 2012 preliminary objections argued that plaintiffs' New Jersey RICO claims and tortious interference claim were deficient.

10. Pls.' Am. Compl. ¶ 205(A)-(Q).

and were done pursuant to a RICO conspiracy, as alleged in Count IV.

Defendants filed preliminary objections to plaintiffs' amended complaint on March 1, 2013. The court issued an order on May 1, 2012 sustaining in part defendants' preliminary objections. This had the effect of eliminating plaintiffs' RICO claims as to all defendants and eliminating the interference with contractual rights and civil conspiracy claims as to all defendants except King and King R&D.

Plaintiffs now file the instant motion for clarification and/or reconsideration. The court's May 1, 2013 order is clarified and reconsidered as follows:

## I. New Jersey RICO:

Under NJ RICO an enterprise is defined as "any individual, sole proprietorship, partnership, corporation, business, or charitable trust, association or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities."[11] Plaintiffs' have asserted that defendants' are enterprises within the meaning of NJ RICO.[12] I am not convinced that Plaintiffs have appropriately alleged that all defendants are individual enterprises, and that they also became one association-in-fact enterprise.[13]

Under NJ RICO, to prove that a defendant has engaged

---

11. N.J.S.A. 2C:41-1(c).

12. Pls.' Am. Compl. ¶¶ 210-215, 223-227, 244-249, 251-254.

13. If all of the defendants are deemed to be an enterprise by their association-in-fact, there might exist a problematic issue with an association-in-fact conspiring with itself to commit a RICO conspiracy. This might be capable of cure pursuant to an amended complaint but this would be useless given the dismissal of all RICO claims.

in a pattern of racketeering activity plaintiff must show: (1) defendant has engaged "in as least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity;" and (2) that "the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents."[14] N.J.S.A. 2S:41-4 allows for civil remedies under NJ RICO. Plaintiffs' have alleged counts under N.J.S.A. 2C:41-2(a)-(d), Prohibited Activities.

A. N.J.S.A. § 2C:41-2(a):

Plaintiffs' amended complaint asserts a count for violations for N.J.S.A. 2C:41-2(a) against all defendants.[15] The court's May 1, 2013 order sustained defendants' preliminary objections as to all defendants.

Pursuant to N.J.S.A. § 2C:41-2(a) "It shall be unlawful for a person who has received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest, directly or indirectly, any part of the income, or the proceeds of the income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in or the activities of which affect trade or commerce." This is known as an "investment injury". As such, a defendant must not only have received income from a pattern of racketeering activity, but must also have

---

14. N.J.S.A. 2C:41-1(d).
15. Pls.' Am. Compl. ¶¶ 209-221.

used or invested that income in a manner that *harms* plaintiff.[16]

In the amended complaint plaintiffs allege defendants engaged in RICO predicate acts through mail and wire fraud by asserting the following: (1) fraud on the courts; (2) communications with the Food and Drug Administration ("FDA"); (3) communications with the Patent and Trademark Office ("PTO"); (4) communications to the Securities and Exchange Commission ("SEC"); and communications with the parties.

Plaintiffs allege that defendants manufactured and sold adulterated drugs, and made fraudulent representations to the FDA regarding those drugs[17]; that defendants submitted sham patent applications to the PTO[18]; and that defendants' entered into an improper agreement which they filed with the SEC, in a heavily redacted form, making it misleading.[19]

B. N.J.S.A. § 2C:41-2(b):

Plaintiffs' amended complaint asserts a count for violations of N.J.S.A. 2C:41-2(b) against all defendants.[20] The court's May 1, 2013 order sustained defendants' preliminary objections as to all defendants.

Pursuant to N.J.S.A. § 2C:41-2(b) "It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control

16. *See* N.J.S.A. § 2C:41-2(a).
17. Pls.' Am. Compl. ¶¶ 101-106, 109-110, 205(A)-(C).
18. Pls.' Am. Compl. ¶¶ 126-140.
19. Pls.' Am. Compl. ¶ 205(M).
20. Pls.' Am. Compl. ¶¶ 222-242.

of any enterprise which is engaged in[,] or activities of which affect[,] trade or commerce." This is known as an "acquisition injury." Essentially, a plaintiff must allege that its injury, apart from injuries caused by the RICO predicate acts themselves, results from defendant's acquisition or maintenance of an interest in, or control over, an enterprise.[21]

C. N.J.S.A. § 2C:41-2(c):

Plaintiffs' amended complaint asserts a count for violations of N.J.S.A. 2C:41-2(c) against all defendants.[22] The court's May 1, 2013 order sustained defendants' preliminary objections as to all defendants.

Pursuant to N.J.S.A. 2C:41-2(c) it "shall be unlawful for any person employed by or associated with any enterprise engaged in activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." In other words, in order for a plaintiff to make a claim under NJ RICO, the plaintiff must allege an injury that flows from the commission of RICO predicate acts.[23]

D. N.J.S.A. § 2C:41-2(d):

Plaintiffs' amended complaint asserts a count for violations of N.J.S.A. 2C:41-2(d) against all defendants.[24] The court's May 1, 2013 order sustained defendants' preliminary objections as to all defendants.

---

21. *See* N.J.S.A. § 2C:41-2(b).
22. Pls.' Am. Compl. ¶¶ 243-249.
23. *See* N.J.S.A. 2C:41-2(c).
24. Pls.' Am. Compl. ¶¶ 250-254.

N.J.S.A. 2C:41-2(d) states it "shall be unlawful for any person to conspire as defined by N.J.S. 2C:5-2, to violate [New Jersey RICO (a), (b), or (c)]." To assert a claim under N.J.S.A. 2C:41-2(d) a plaintiff must allege a conspiracy which claims an injury resulting from an act prohibited under RICO.

## DISCUSSION OF RICO CLAIMS

### 1. STANDING

#### a. Predicate Acts

As stated in *Sedima, S.P.R.L. v. Imrex Co., Inc.* a RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."[25] One of the critical requirements is, therefore, that the predicate act conduct itself causes an injury. One of the fundamental failures of Plaintiffs' RICO claims in this case is that the individual predicate offenses of mail and wire fraud did not, in fact, directly cause injury to Plaintiffs' business.

The amended complaint, read in a light favorable to plaintiffs, establishes that plaintiffs and the Mutual defendants entered into a contract, and that the Mutual and King defendants thereafter engaged in fraudulent conduct which prevented plaintiffs from receiving what was due them under the contract. Although a number of the acts which helped perpetrate the fraud can be considered to be mail and wire fraud, the *acts themselves* did not cause the pecuniary injury. It was the breach of contract which caused the injury.

---

25. 473 U.S. 479, 496 (1985).

*Bridge v. Phoenix Bond & Indemnity Co.* is one of the more recent Supreme Court cases which discusses this concept.[26] It should first be noted that the holding of the case was that a plaintiff can recover under RICO, even when the predicate act of mail fraud was directed to a third party, and the misrepresentation in that third party communication was not "relied upon" by plaintiff. This holding resolved a circuit courts' conflict.

Plaintiffs have relied upon language in *Bridge* to support its contention that so long as it is "reasonably foreseeable" that harm would result to plaintiff from a defendant's mail fraud, causation of the fraud is satisfied. This is not the state of the law.

In *Bridge*, individual contracts[27] were being "let out" to qualified parties on a rotational basis. So that the contracts could be distributed on a proportionate basis to all qualified parties, a county rule prohibited qualified parties from submitting multiple bids using apparent agents, or related entities. The plaintiff alleged that the defendants submitted perjured compliance attestations so that defendants would obtain more contracts that the rules allowed.

The complete quote concerning causation is:

[Plaintiff's] alleged injury — the loss of valuable [contracts] — is the direct result of [defendant's] fraud. It was a foreseeable and natural consequence of [defendant's] scheme to obtain *more* liens for themselves[,] that other bidders would obtain *fewer*

---

26. 128 S.Ct. 2131 (2008).

27. The "contracts" were actually giving the bidder the right to foreclose on tax liens. The practice evolved so that all bids became equal to the amount of the liens, so that there really was no price competition with respect to each bid.

liens.[28]

The requirement of a "direct injury" is noted at least a half dozen times throughout the opinion. Under the circumstances, the multiple fraudulent bids *directly*, and at *that immediate time*, caused the plaintiff to *actually lose* identifiable valuable contracts. The language of "foreseeable and natural consequence of [defendant's] scheme" can only refer to *defendants'* required mens rea; i.e., the fact that there would be a direct injury to the plaintiff was reasonably *known* to the *defendant*, as opposed to a direct injury occurring to the plaintiff in some unusual manner that could not reasonably be foreseen by a defendant. This lack of foreseeability could possibly negate a fraudulent mens rea, by a defendant arguing that the direct result was unforeseeable and unintended.

Additionally, the *Bridge* case specifically prohibits a "but for" test.[29]

In the case at bar, plaintiffs have simply listed a series of events that ultimately, and in their totality, allowed defendants to breach the licensing agreement; as opposed to showing that any predicate act *directly* caused any *particular* pecuniary damage to plaintiffs.

Consequently, plaintiffs do not have standing to bring a RICO action, and no amendment to the complaint can cure this.

b. 2C:41 — 2(a) Investment Injury[30]

---

28. *Bridge*, 128 S.Ct. at 2144 (emphasis added).

29. *Id.*

30. As literally hundreds of cases have been cited by all parties, the court has relied on the treatise: *Civil RICO, A Definitive Guide*, 3rd Ed. 2010, Gregory P. Joseph.

It is insufficient to allege that a RICO defendant simply reinvested racketeering proceeds into its already existing ongoing business,[31] and the Third Circuit requires an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate [racketeering] acts themselves.[32]

The reason for this is 2C:41-4. Not only must one prove a 2C:41-2(a) investment violation, but 2C:41-4 requires a plaintiff to show that it sustained injury *because of* it. There simply must be something beyond an ongoing business remaining an ongoing business, to maintain a RICO action. The income must be used or invested in a manner that harms plaintiff.[33]

It should also be noted that plaintiffs agree that most of Mutual's "legitimate" income was derived from legitimate sales.[34]

Finally, there is also the fact that essentially all of the other income the Mutual defendants received was through a contract or other dealings with the King defendants.

This reinforces my belief that this case is a breach of contract case, with common law fraud and fiduciary elements also existing. Plaintiffs' harm, as alleged, is that the Mutual defendants and the King defendants entered into a private contract, which breached the licensing agreement with plaintiffs and profited themselves at plaintiffs' expense.

---

31. *Id.* at p.63.
32. *Id.* citing *Guy's Mechanical Systems, Inc. v FIA Card Services,, N.A.*, 339 Fed.Appx 193 (3rd Cir. June 22, 2009); *see also: Rose v. Bartle*, 871 F.2d 331, 356-59 (3d Cir. 1989).
33. *Civil RICO, A Definitive Guide*, p. 64.
34. Pls.' Am. Compl. ¶ 46.

c. 2C:41 — 2(b) Acquisition Injury

Again, the analysis is similar to Investment Injury.[35]

d. 2C:41 — 2(c) Participation Injury

I rely upon discussion 1.a. Predicate Acts, *supra*.

e. 2C:41 — 2(d) Conspiracy

As the allegations of 2C:41 2(a), 2(b), and 2(c) are infirm, the conspiracy to do so also fails.[36]

## 2. FINAL REASONING

Although the preceding discussion fully disposes of the RICO claims, I feel compelled to make a further observation not specifically put forward by Mutual and King (for obvious reasons).

While not necessarily being an independent reason for dismissal of the RICO claims, I am again reinforced in believing that dismissal is proper. I am referring to the manner in which plaintiffs and Mutual arrived at their licensing agreement.

Plaintiffs fully admit throughout their amended complaint not only that they believed Mutual capable of unethical and criminal conduct;[37] but also that they essentially gave Mutual the contractual powers, through the license agreement, to do exactly what Mutual eventually did;[38] and that Dr. Spireas actually did certain actions that helped Mutual and King's schemes.[39] After all

---

35. *Civil RICO. A Definitive Guide*, pp. 65- 67. Plaintiff submitted no separate harm *merely* from defendants' control of the enterprise.
36. *Civil RICO. A Definitive Guide*, p.85.
37. Pls.' Am. Compl. ¶¶ 26 -37, 48-49, 51, 62, 66-68.
38. Pls.' Am. Compl. ¶¶ 40-41, 102, 111.
39. Pls.' Am. Compl. ¶¶ 38, 59-60.

of this, plaintiffs take the position that they were surprised that Mutual engaged in the exact conduct plaintiffs knew about, enabled, and helped.[40] Thereafter, plaintiffs essentially admit that their damages are for breach of the licensing agreement.[41]

### Interference With Contractual Rights and Civil Conspiracy

With regard to tortious interference with contract, I had originally sustained the preliminary objections with respect to Pharma defendants, stating that a party cannot interfere with its own contract. I had also sustained the preliminary objections with regard to civil conspiracy, much for the same reason.

Upon reconsideration, there are a sufficient number of Pharma defendants wherein there might exist a viable interference with contract by a number of Pharma defendants other than the actual Pharma defendant contract signatory. Consequently, Count V and Count VI are reinstated, and the preliminary objections to these counts are overruled.

### Conclusion:

The court's May 1, 2013 order sustaining in part defendants' preliminary objections is clarified and reconsidered. All RICO claims are dismissed. The tortious interference with contract and civil conspiracy claims are reinstated, as plead, with respect to all defendants.

### ORDER

---

40. Pls.' Am. Compl. ¶¶ 52-54, 97-101.
41. Pls.' Am. Compl. ¶¶ 111-115.

And now, this 13th day of December, 2013, upon consideration of plaintiffs' motion for clarification and/or reconsideration of the court's May 1, 2013 order sustaining in part defendants' preliminary objections, and any response in opposition thereto, it is hereby ordered that the motion is granted in part. The court's May 1, 2013 order is clarified as follows[1]:

(1) Plaintiffs' Count I, N.J.S.A. § 2C:41-2(a), is dismissed as to all defendants;

(2) Plaintiffs' Count II, N.J.S.A. § 2C:41-2(b), is dismissed as to all defendants;

(3) Plaintiffs' Count III, N.J.S.A. § 2C:41-2(c), is dismissed as to all defendants;

(4) Plaintiffs' Count IV, N.J.S.A. § 2C:41-2(d), is dismissed as to all defendants;

The court's order is reconsidered as follows:

Plaintiffs' Count V, Interference with Contractual Rights, is reinstated.

Plaintiffs' Count VI, Civil Conspiracy, is reinstated.

The remainder of the motion is denied.

Plaintiffs may not file a second amended complaint.

Defendants have thirty days from the docketing of this order to file answers to the amended complaint.[2]

---

1. *See* attached memorandum.

2. All paragraphs of the amended complaint remain, as stated. The legal ruling in this order only eliminates causes of action, and does not eliminate any pled paragraphs. All the pled paragraphs are relevant to the two remaining causes of action